**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gavino Esquivel, | No. CV-15-00090-PHX-NVW |
| Plaintiff, | |
| v. | **ORDER** |
| City of Yuma; Joseph Carrillo, | |
| Defendants. | |

Before the Court is Defendants City of Yuma and Officer Joseph Carrillo's Motion for Summary Judgment (Doc. 71). Oral argument was heard on April 20, 2016.

**I.     LOCAL RULES REGARDING MOTIONS FOR SUMMARY JUDGMENT**

The Rules of Practice of the United States District Court for the District of Arizona ("Local Rules") require that any party filing a motion for summary judgment file a statement, separate from the motion and memorandum of law, that sets forth each material fact on which the party relies in support of the motion. LRCiv. 56.1(a). Any party opposing a motion for summary judgment must file a separate controverting statement of facts. LRCiv 56.1(b).

The moving party may file a reply memorandum, but the Local Rules do not authorize filing a separate statement responding to the nonmoving party's controverting statement of facts. *See* LRCiv 56.1(d). The moving party may include its evidentiary objections to the nonmoving party's controverting statement of facts in its reply memorandum. LRCiv 7.2(m)(2). The moving party would need to seek and obtain leave

to file another separate statement.  If such leave were granted, the nonmoving party would be granted opportunity to respond.

The Court has considered Defendants City of Yuma and Officer Joseph Carrillo's Motion for Summary Judgment (Doc. 71), Defendants' Separate Statement of Facts in Support of Their Motion for Summary Judgment (Doc. 72), Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. 81), Plaintiff's Controverting Statement of Facts and Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment (Doc. 82), and Defendants' Reply in Support of Their Motion for Summary Judgment (Doc. 92).  The Court has not considered the separately filed Defendants' Objections to Plaintiff's Statement of Additional Facts (Doc. 93), which is not authorized by the Local Rules and for which Defendants did not seek leave to file.  Defendants' Objections to Plaintiff's Statement of Additional Facts (Doc. 93) will be stricken.

## II.   LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial.  Summary judgment should be granted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of showing the absence of genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, once the movant shows an absence of evidence to support the nonmoving party's case, the burden shifts to the party resisting the motion.  The party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial" and may not rest upon the pleadings. *Anderson*, 477 U.S. at 256.  To carry this burden, the nonmoving

party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. 56(e)(2).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

## III.   MATERIAL FACTS

### A.   The March 1, 2014 Incident

At approximately 2:00 a.m., on March 1, 2014, Plaintiff and friends arrived at the International House of Pancakes restaurant in Yuma, Arizona. Before going to the restaurant, Plaintiff consumed approximately 10 or 11 alcoholic beverages.[1] While Plaintiff was seated at a table with friends, he made comments and gestures to a group seated at a table across the room, who responded. Plaintiff, a Hispanic male, began the exchange by asking a black male in the other group, "How are you doing, Obama?" The black male responded, "How are you doing, Chapo?" As the exchange continued, people from both tables stood up, and at one point Plaintiff and the black male stood in an open area between their tables, facing each other, speaking loudly and gesturing, but not making physical contact.

At approximately 2:43 a.m., the restaurant manager called 911 and asked for immediate assistance, saying two groups of customers were arguing and she wanted them

---

[1] At 3:30 a.m. Plaintiff's blood alcohol level was measured at 0.163%.

escorted out of the restaurant. She said that nine individuals were involved. She described a black male wearing a blue shirt arguing with a Hispanic male. At first the manager said that the dispute was not "physical," but a minute or two later, she said the dispute was "getting to that point." The manager told the 911 operator that no weapons were involved.

At approximately 2:44 a.m., a City of Yuma dispatcher broadcasted a high priority disturbance call involving possibly nine people at the International House of Pancakes restaurant. The dispatcher described it as a verbal disturbance, but less than a minute later, the dispatcher said, "It sounds like it is physical now." Approximately twelve police officers responded to the scene.

Officers Joseph Carrillo and Victor Reyes were the first officers to arrive at the restaurant. Officer Reyes entered the restaurant first, and Officer Carrillo was approximately ten feet behind him. As the manager walked toward the entrance and the police officers, one of the servers told the manager that someone had a gun. Plaintiff began walking quickly behind the manager toward the entrance. As Officer Reyes entered, the manager pointed to Plaintiff and said, "That's one of them." Plaintiff began to leave the restaurant. As Officer Carrillo entered the foyer, Officer Reyes pointed to Plaintiff and said, "That's one of them." During this time, the manager also said that one of the two men involved in the disturbance had a gun. One of the officers told Plaintiff to "hold on," Plaintiff stopped and said, "I gotta go," and then Plaintiff took off running. Plaintiff ran around the restaurant to the back of the restaurant, toward a motel. Officer Carrillo ran after Plaintiff.

Officer Carrillo ordered Plaintiff to stop running, but Plaintiff did not hear him and did not stop running away from Officer Carrillo. Plaintiff also did not hear Officer Carrillo warn him that if he did not stop, he would be tased. It is Officer Carrillo's usual practice to issue a warning before deploying his Taser, but he does not remember whether he did. Approximately ten seconds after Officer Carrillo first saw Plaintiff, he tased

Plaintiff in dart mode[2] at a distance of 10 to 12 feet, causing Plaintiff to fall on asphalt. No one saw Officer Carrillo tase Plaintiff. Within a few minutes after Officer Carrillo tased Plaintiff, he conducted a warrants check, which revealed that Plaintiff had an outstanding warrant for his arrest for bad check/insufficient funds.

Subsequently, Plaintiff was detained, transported, and treated at Yuma Regional Medical Center. The physician found Plaintiff to be initially disoriented and grossly intoxicated. He noted multiple contusions, abrasions, and lacerations. The physician also noted, "The patient gradually resolved his intoxication, became alert, oriented, stable and uncooperative." Plaintiff refused an elbow splint and suturing of small lacerations of the abdomen and forehead. Radiology tests showed a nondisplaced fracture of Plaintiff's right elbow and fractures of the nasal bone. Lab tests showed Plaintiff's blood alcohol level to be 0.163%.

Officer David Williams was the investigating officer for the March 1, 2014 incident. He made the decision to charge Plaintiff with misdemeanor disorderly conduct. At the Yuma Regional Medical Center, Officer Carrillo read Plaintiff his Miranda rights and issued Plaintiff a citation for misdemeanor disorderly conduct pursuant to A.R.S. § 13-2904(A)(1). Plaintiff also was charged for the outstanding warrant. On June 20, 2014, the charges against Plaintiff were dismissed with prejudice due to prosecutorial discretion.

A.R.S. § 13-2904(A) defines misdemeanor disorderly conduct as engaging in "fighting, violent or seriously disruptive behavior," making "unreasonable noise," or using "abusive or offensive language or gestures to any person present in a manner likely

---

[2] In "dart mode," the Taser projects two prongs or darts per deployment. In this mode, the Taser usually incapacitates a target by overriding his central nervous system through a series of electrical pulses. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012). In "drive-stun mode," the weapon's exposed electrodes are placed in direct contact with the target's skin, causing pain but not incapacitation. *Id.* Drive-stun mode is used to encourage a suspect to comply with officers. *Id.*

to provoke immediate physical retaliation by such person."   Disorderly conduct that involves recklessly handling, displaying, or discharging a deadly weapon or dangerous instrument is a class 6 felony.  A.R.S. § 13-2904(B).

    **B.**    **Yuma Police Department's Use of Force Policies and Procedures**

The Yuma Police Department ("YPD") has adopted policies and procedures regarding the use of force by its officers.  YPD Policy 2.25, which was in effect on March 1, 2014, provides that YPD officers shall be trained in the use of weapons and response options when confronted with situations that may require use of force.  YPD Policy 2.25 advises officers that electronic control devices ("ECDs") are intermediate control techniques that have the probability of causing injury.  The Taser used by Officer Carrillo on Plaintiff is an ECD.  YPD Policy 2.25 states that ECDs "shall be carried in accordance with current policies and training practices" and any deployment shall "be reasonable, based on the totality of the circumstances, and in compliance with statutes and current training."   YPD Policy 2.25 instructs officers to consider the following list of circumstances to determine if using a particular method of force is warranted:  (a) the severity of the crime; (b) whether the suspect poses an immediate threat to the safety of officers or others; (c) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; (d) age, size, ability, and physical conditioning of the suspect versus that of the officer; (e) weapon and/or dangerous instrument; and (f) duration of altercation between the suspect and the officer.

YPD Policy 2.25 requires an officer who uses force to complete a Use of Force form, which is reviewed by a first line supervisor.  The Use of Force form is then forwarded to the Chief's Office via the chain of command, along with a copy of the incident report.  The chain of command may recommend that the incident be forwarded to Internal Affairs for further investigation or to the Use of Force Board.  The Chief of Police reviews every Use of Force report that is completed by a YPD officer who uses force.  The Chief of Police or the Deputy Chief of Police will review the Use of Force

form and assign necessary follow-up, which may include corrective and/or disciplinary action.

YPD's Professional Standards Unit and Training Unit annually review YPD's uses of force to analyze patterns that could affect training or equipment needs. YPD officers receive training regarding appropriate uses of force, and the training is approved by the Arizona Peace Officers Standards and Training Board. The training includes compliance with constitutional standards and the Arizona Revised Statutes governing use of force. It also includes training YPD officers regarding completing a Use of Force form.

YPD officers are specifically trained and certified in the use of a Taser, and the training is approved by the Arizona Peace Officers Standards and Training Board. YPD officers are trained that Taser deployment must be objectively reasonable under the totality of the circumstances. The training program includes guidelines for use of a Taser, which include not using a Taser against subjects "solely for running from an officer." YPD officers are taught that tased individuals may be secondarily injured as a result of falling after being tased. They also are taught regarding high risk individuals, such as elderly people and pregnant women. To become recertified, YPD officers must attend annual training and pass a written exam. They are also required to attend practical simulated training conducted by outside agencies.

Officer Carrillo was trained in use of force techniques, specifically as related to Taser deployment, and was certified for Taser use. Officer Carrillo was taught not to use a Taser against a subject solely for running from an officer.

After the March 1, 2014 incident, Officer Carrillo wrote a brief summary of the incident. It states that Officer Carrillo responded to a disturbance inside a business. It further states that Plaintiff fled on foot toward the rear of the business, was apprehended after a Taser deployment, was placed under arrest for an unrelated warrant, and was transported to the Yuma Regional Medical Center ("YRMC") for minor injuries. The summary describes statements made by Plaintiff at the medical center, that Plaintiff was

intoxicated and provided very little detail regarding the incident, and that Plaintiff was issued a citation for disorderly conduct.

Subsequently, Officer Carrillo completed a Use of Force form. He stated that an electronic control device was applied once for 5 seconds, the probes penetrated skin, and the distance to subject was 10 feet. Officer Carrillo stated:

> I was dispatched to physical disturbance at IHOP located at 575 E 16th St. I was given information that a [H]ispanic male wearing a plaid shirt was involved in the physical disturbance. Information was received that someone had displayed a handgun, at the time it was unsure which subject was armed. As I entered the building a subject ([identified] as Gavino ESQUIVEL) exited the building who matched the description. I told him to stop and he began to sprint away from me ignoring my verbal commands. I gave G. ESQUIVEL several verbal commands telling him "police, stop running". G. ESQUIVEL continued to sprint as I chased after him on foot. G. ESQUIVEL had exited the door a few seconds before I had, so he was approximately 15 feet away as we were running. G. ESQUIVEL had ran toward the back parking lot where it were just me and him. There were no other officers on scene other than Officer REYES who was inside with the other subjects. I was concerned that G. ESQUIVEL was already at the elevated [aggression] level being he was involved in a fight. I thought G. ESQUIVEL might be armed with a handgun as I didn't know which subject was armed. My concern was that G. ESQUIVEL might pull his weapon on me if I engaged him hands on by myself. I pulled my ECD and deployed it striking G. ESQUIVEL in the back and the buttocks at a distance of approximately 10 feet. G. ESQUIVEL locked up and fell to the ground. I held G. ESQUIVEL to the ground and waited for other officers to arrive. Once other officer[s] were on scene we were able to gain control of G. ESQUIVEL and place him into handcuffs. G. ESQUIVEL sustained a laceration as a result of the fall. He was transported to YRMC via YFD.

Chief of Police John J. Lekan personally reviewed Officer Carrillo's Use of Force report regarding the March 1, 2014 incident. Upon review of the March 1, 2014 incident report and Officer Carrillo's Use of Force report, as well as any information learned from supervisors and/or the chain of command about the incident, Chief Lekan concluded that Officer Carrillo's conduct was compliant with YPD's use of force policies and

procedures.  Corrective or disciplinary action was not taken for Officer Carrillo's use of force on March 1, 2014.

C.     **Yuma Police Department's Warrantless Arrest Policies, Procedures, and Training**

YPD Policy 4.28 identifies two basic types of arrests:  (1) arrest with a warrant, and (2) arrest without a warrant based on probable cause.  YPD Policy 4.30 provides that an officer may arrest a person without a warrant if the officer has probable cause to believe a misdemeanor or a petty offense has been committed and the officer has probable cause to believe the person to be arrested has committed the offense.  YPD officers receive training regarding warrantless arrests, applying the definitions of "reasonable suspicion" and "probable cause," and making lawful arrests of suspects.  YPD does not have any department-wide policy, practice, procedure, official or unofficial, allowing its officers to arrest individuals contrary to the Fourth Amendment or any other law.

Officer Carrillo was trained to make seizures based on reasonable suspicion and/or probable cause.  Upon review of the March 1, 2014 incident report and Officer Carrillo's Use of Force report, as well as any information learned from supervisors and/or the chain of command about the incident, Chief Lekan concluded that Officer Carrillo's conduct was compliant with YPD's arrest policies and procedures.

Plaintiff's Complaint alleges five counts:  (1) peace officer liability under 42 U.S.C. § 1983 against Defendant Carrillo individually and in his official capacity for use of excessive force; (2) municipal liability under 42 U.S.C. § 1983 against Defendant City of Yuma for failing to supervise and train its police officers and for overlooking and covering up officer misconduct related to the use of excessive force; (3) assault against Defendant Carrillo; (4) false imprisonment against both Defendants; and (5) malicious prosecution against both Defendants.  The Complaint also seeks punitive damages and attorney's fees.

IV.    **ANALYSIS**

    A.    **Municipal Liability Under § 1983**

Count Two of Plaintiff's Complaint alleges municipal liability under 42 U.S.C. § 1983 against Defendant City of Yuma for failing to supervise and train its police officers and for overlooking and covering up officer misconduct related to the use of excessive force.  To establish § 1983 municipal liability, Plaintiff must satisfy one of three conditions:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.  Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy.  Whether a particular official has final policy-making authority is a question of state law.  Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir.1992) (citations and internal quotation marks omitted).

Plaintiff offers no evidence of a department-wide failure to train and supervise YPD officers concerning proper uses of force and lawful arrest procedures.  In fact, Plaintiff concedes that "Officer Carrillo was well-trained on the Fourth Amendment and the use of a [T]aser."  (Doc. 81 at 9.)  Officer Carrillo did not have final policy-making authority.  The only basis Plaintiff provides for imposing liability on the City of Yuma is that the Police Chief ratified Officer Carrillo's allegedly unconstitutional conduct by reviewing information about the March 1, 2014 incident and doing nothing more.

Municipalities generally are not liable under § 1983 for the unconstitutional discretionary actions of municipal employees.  *Gillette*, 979 F.2d at 1347.  Proving ratification requires evidence that a municipal policymaker made a conscious, affirmative choice among various alternatives to follow a particular course of action.  *Id.* at 1348.

Holding cities liable under § 1983 "whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law," creating an "end run around *Monell*." *Id.*; *accord Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010). Here, Chief Lekan reviewed the March 1, 2014 incident report, Officer Carrillo's Use of Force report, and perhaps other information, and did not assign corrective or disciplinary action. There is no evidence that Chief Lekan made a conscious, affirmative choice to ratify Officer Carrillo's actions.

At oral argument, Plaintiff's counsel conceded that the evidence does not support finding the City of Yuma liable for Officer Carrillo's alleged misconduct. Therefore, Defendants' Motion for Summary Judgment will be granted regarding municipal liability under 42 U.S.C. § 1983 against Defendant City of Yuma.

## B.   Officer Carrillo's Qualified Immunity Under § 1983

Under § 1983, government officials sued in their individual capacities may assert the affirmative defense of qualified immunity, which generally protects them from civil damages for performance of discretionary duties. *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002); *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009). Qualified immunity protects an official who "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004). "The standard is an objective one that leaves 'ample room for mistaken judgments.'" *Mueller*, 576 F.3d at 992 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley*).

To determine whether a law enforcement officer is entitled to qualified immunity, the district court must determine (1) whether the officer violated a plaintiff's

constitutional right and (2) whether the constitutional right was "clearly established in light of the specific context of the case" at the relevant time. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). The court may address the questions in either order. *Id.* Here, Plaintiff's constitutional right was not "clearly established in light of the specific context of the case" on March 1, 2014, and the Court does not decide whether Officer Carrillo violated Plaintiff's constitutional right.

To determine whether Plaintiff's constitutional right was clearly established, the Court must consider whether the contours of the law were "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 442 (quoting *al-Kidd*, 131 S. Ct. at 2083). The law may be clearly established without a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Although *Graham v. Connor*, 490 U.S. 386, 395 (1989), gives general guidance for determining whether a particular use of force is unconstitutionally excessive, it does so at a level of generality that does not always provide fair notice to every reasonable law enforcement officer that his or her particular conduct is unconstitutional.. *Mattos*, 661 F.3d at 442. The Supreme Court has

> repeatedly told courts not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.

*Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citations omitted).

Whether a law enforcement officer has used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen must be analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham*, 490 U.S. at 395. "The 'reasonableness' of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Excessive force analysis involves three steps: (1) assessing the severity of the intrusion on the individual's constitutional rights by evaluating the type and amount of force inflicted, (2) evaluating the government's interest in the use of force, and (3) balancing the gravity of the intrusion on the individual's rights against the government's need for that intrusion. *Lowery v. City of San Diego*, __ F.3d __, 2016 WL 1273183 at *3 (9th Cir. Apr. 1, 2016). The government's interest in the use of force depends on numerous factors, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Mattos*, 661 F.3d at 441. The most important factor is whether the suspect posed an immediate threat to safety. *Id.* But balancing the individual's constitutional interests against the government interests at stake requires considering "the totality of the circumstances, including whatever factors may be relevant in a particular case." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174–75 (9th Cir. 2012).

In 2010, the Ninth Circuit held that use of a Taser in dart mode constitutes an intermediate level of force that must be justified by the government interest involved. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). The appellate court held that the totality of the circumstances did not justify deployment of the Taser where the suspect's volatile, erratic behavior indicated potential danger, but did not pose an immediate threat to officers or bystanders. In July 2005, a police officer pulled a car over for the driver's failure to wear a seatbelt. The officer told the driver to remain in the car, which the driver asserts he did not hear, and the driver got out of the car. The driver shouted gibberish and expletives, but he did not make any physical or verbal threat

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

against the officer.  It should have been apparent the driver was unarmed because he wore only tennis shoes and boxer shorts.  The driver was standing 15–25 feet away from the police officer and was not moving toward the officer.  When he was tased in dart mode, the driver fell forward on his face, away from the officer.  There was no evidence of nearby pedestrians or traffic.  The appellate court found no substantial government interest in using significant force to arrest the driver, even if the officer reasonably believed that the driver had resisted a police officer, failed to comply with a lawful order, and was under the influence of a controlled substance, because the driver posed little to no safety threat.  Two additional factors weighed against finding the officer's use of force reasonable:  (1) the officer failed to warn the driver he would be tased if he did not comply with the order to remain in the car when a warning was feasible, and (2) less intrusive alternatives were available, such as waiting for the additional officers who were en route to the scene.  The appellate court concluded that all of the factors of *Graham*, plus recent cases, put the officer on fair notice that an intermediate level of force was unjustified, but as of July 2005, there was no Supreme Court or Ninth Circuit decision addressing whether the use of a Taser in dart mode constituted an intermediate level of force.  *Id.* at 832-33.  Therefore, the officer was entitled to qualified immunity.  *Id.* at 833.

In 2011, the Ninth Circuit granted en banc review of two separate cases in which different panels reversed the district courts' decisions and held that the officers were entitled to qualified immunity on § 1983 claims.  *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc).  Upon en banc review, the Ninth Circuit held the law was not clearly established at the time of the 2004 and 2006 incidents.  *Id.* at 436.

In November 2004, a police officer pulled over a woman driving 32 miles per hour in a 20-miles-per-hour school zone.  The driver, who was seven months pregnant, insisted she had not been speeding and refused to sign the citation.  A second officer approached and explained to the driver that signing the citation would only confirm that she had

received it and would not constitute an admission of guilt.  A few minutes later, a police sergeant arrived and also asked the driver to sign the citation.  When she refused again, the sergeant directed the officers to book her.  The driver refused to get out of her car, one of the officers showed her a Taser, the officer cycled the Taser showing the driver what it did, the officers discussed where best to apply the Taser to the pregnant woman, and the officers unsuccessfully attempted to remove the driver from her car.  Over the span of a minute, the officer applied the Taser in drive-stun mode three times:  first, to the driver's left thigh, then to her left arm, and finally to her neck.  After the driver fell over in her car, the officers dragged her out of the car, laid her face down on the street, and handcuffed her.  The driver did not experience any lasting injuries from the incident except for permanent burn scars; the baby was born healthy and remained healthy for at least six years.  The Ninth Circuit concluded that the driver's offenses did not constitute serious crimes, and the driver did not pose even a potential threat, much less an immediate threat, to the safety of the officers or others.  The driver resisted arrest, but her resistance did not involve any violent actions toward the officers.  Thus, a reasonable fact finder could conclude that the officers' use of force was unreasonable and constitutionally excessive.  *Id.* at 446.  However, at the time the officers tased the driver in November 2004, there were three circuit courts of appeal cases rejecting claims that use of a Taser constituted excessive force, and no circuit cases finding a Fourth Amendment violation.  *Id.* at 448.  The Ninth Circuit therefore concluded that the law was not sufficiently clear at the time of the 2004 incident to render the alleged violation clearly established, and the officers were entitled to the defense of qualified immunity against the § 1983 excessive force claim.  *Id.*

In August 2006, when police officers arrived at a residence where a domestic dispute had been reported, the large and seemingly intoxicated husband sat outside the front door, said he and his wife had a verbal argument, and became agitated and rude upon further questioning.  When one of the officers asked to speak to the wife, the

husband went inside to get her, and a second officer stepped inside.  When the husband returned with the wife, he became angry when he saw the officer inside, and he told the officer to get out.  The officer asked to speak to the wife outside and she agreed, but before she could comply, a third officer entered the residence and announced that the husband was under arrest.  The wife was between her husband and the third officer and did not immediately move out of the way.  As the third officer pushed against her, the wife extended her arm, and the officer asked, "Are you touching an officer?"  At the same time, the wife asked the second officer why her husband was being arrested, asked everyone to calm down, and expressed concern that her sleeping children not be disturbed.  Then, without warning, the third officer deployed his Taser in dart mode at the wife, and she fell hard on the floor.  The husband was charged with harassment and the wife with harassment and obstructing government operations.  The Ninth Circuit concluded that the wife's crime, if any, was not severe, the wife posed no threat to the officers, she was attempting to comply with the officers' request to speak outside when she got physically caught between her husband and the third officer, and she was tased in dart mode without warning.  *Id.* at 451.  Thus, a reasonable fact finder could conclude the officers' use of force was constitutionally excessive.  *Id.*  But the Ninth Circuit concluded that in August 2006 there was no Supreme Court or Ninth Circuit decision addressing the use of a Taser in dart mode, and the constitutional violation was not so obvious to be clearly established as such under *Graham*.  *Id.* at 452.  Therefore, the officers were entitled to qualified immunity for tasing the wife in the 2006 incident.  *Id.*

In 2012, the Ninth Circuit affirmed summary judgment in favor of police officers on § 1983 claims of excessive force for repeatedly deploying a Taser against a combative suspect who died.  *Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir. 2012).  In July 2007, outside of a residence, two police officers were told by family members that a man was attempting to perform an exorcism on his three-year-old granddaughter.  The officers radioed for instructions, but decided they could not wait after they heard a little girl

screaming.  The screaming continued while officers entered the house.  At the closed bedroom door, they identified themselves as police officers.  Although the door was blocked by a bed, the officers were able to open it enough for one of them to get through. When he entered the bedroom, the walls and furniture were smeared with blood, and the man was reclining on a bed with the now silent and motionless three-year-old in a chokehold, his hands hidden.  The man's 19-year-old daughter was naked in the corner screaming, and her face showed signs of a recent beating.  The officer ordered the man to let go of the child or he would tase him.  When the man did not comply, the officer deployed the Taser in dart mode.  Because the cramped bedroom conditions prevented the officer from standing far enough away from the man, the Taser did not incapacitate the man.  After a second attempt at tasing in dart mode, the officer switched the Taser to drive-stun mode.  While he was doing so, the second officer was able to extract the child and join the first officer.  The man kicked the first officer in the thighs and groin, and the officers repeatedly attempted to tase the flailing man in drive-stun mode.  Although the Taser's trigger was depressed 22 times, the record supported the inference that the man received two five-second cycles while ineffectively deployed in dart mode and seven in drive-stun mode.  The police officers then wrestled him into submission, but the 19-year-old daughter began trying to assault one of the officers.  After tasing her, the officers returned their attention to the man, found he had a weak pulse, and attempted resuscitation.  The man went into cardiac arrest and died.

In *Marquez*, the Ninth Circuit found the relevant factors favored a finding that the officers' use of force was reasonable.  *Id.* at 1175.  The blood-spattered room, an injured young woman, and a child in evident distress gave cause to believe at least one serious crime had occurred.  The suspect actively resisted arrest after being warned he would be tased if he did not comply.  The officers reasonably could have thought the man posed an immediate risk to the young woman and to themselves.  Therefore, the Ninth Circuit concluded that the officers' use of significant force was justified by the considerable

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

government interests at stake.  *Id.* at 1176.  Because it found no constitutional violation, the court did not reach the district court's alternative conclusion that the officers were entitled to qualified immunity because any violation of the Fourth Amendment was not clearly established at the time of the incident.  *Id.* at 1176 n.8.

In 2013, the Ninth Circuit affirmed the district court's finding that a police officer's tasing of passive bystander without warning constituted a Fourth Amendment violation, but reversed the grant of qualified immunity.  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013).  In 2008, officers were called to a suicide in progress.  The elderly man was sitting in his car in the side yard with a hose running from the exhaust pipe into one of the car's windows.  The officers were warned that the man owned a gun and would have it with him.  After several requests, the man turned the car off and stepped out.  After the man refused multiple commands to show his hands, an officer tased him in dart mode.  The man fell to the ground, but as officers attempted to handcuff him, the man pulled his arms underneath him.  He was then tased a second time.  When the next-door neighbors heard the noise, they came outside of their house into the yard between their house and the elderly man's house.  They heard the elderly man moaning in pain and saw officers holding him on the ground.  From about 37 feet away, the husband called out, asking what the officers were doing to the elderly man.  At least two officers yelled commands; one instructed the husband to "get back," while the other told him to "stop."  The husband took one or two steps back and then stopped.  One of the officers ran toward the husband, pointing a Taser at him, and yelled at him to "get back."  The husband froze.  The officer began to warn the husband he would be tased, but fired his Taser in dart mode before finishing the warning.  After paramedics removed the Taser's barbs, the husband was arrested and charged with obstructing a police officer.

On these facts, the Ninth Circuit found that the government's interests at stake did not justify the use of the discharge of a Taser in dart mode.  *Id.* at 1091.  Even if the neighbor failed to immediately comply with an officer order to move back, when he

1
2
3
4
5
6
7
8
9
10
11

already was standing 37 feet away, the neighbor's crime was far from severe.  There was no reason to believe the neighbor posed an immediate threat to anyone's safety.  The officer's purported fear that the neighbor might have a gun was based on nothing more than the reality that any civilian bystander could be armed.  The neighbor did not resist or attempt to escape.  The Ninth Circuit acknowledged that suicide calls, like domestic violence calls, may pose greater than usual risk to officers' safety, but such potential danger could not be attributed to the neighbor who had no perceptible connection to the attempted suicide.  Finally, it was feasible to give a warning, and the officer did so as he fired his Taser, which rendered the warning meaningless.  Thus, a reasonable fact finder could conclude that the use of force was unreasonable and excessive, in violation of the Fourth Amendment.  *Id.* at 1092.

12
13
14
15
16
17
18
19
20
21

Regarding qualified immunity, the Ninth Circuit found that before 2008 the law was clearly established that a police officer's use of non-trivial force for engaging in mere passive resistance was unconstitutional even though the Ninth Circuit did not identify Tasers in dart mode as an intermediate level of force until 2010.  *Id.* at 1093-94.  Because the neighbor engaged in no behavior that could have been perceived as threatening or resisting, took no affirmative step to violate an officer order, and had no connection to the underlying crime, the use of non-trivial force *of any kind* was clearly unreasonable in 2008.  *Id.* at 1094.  The court further found that "it was well known as of 2008 that a taser in dart mode constitutes more than trivial force."  *Id.* at 1096.  Therefore, the officer was not entitled to qualified immunity.

22
23
24
25
26
27

Absent binding precedent, the Ninth Circuit looks to all available decisional law, including the law of other circuits, to determine whether a right was clearly established.  *Gravelet-Blondin*, 728 F.3d at 1095.  In 2015, the District of Columbia Circuit surveyed cases from the Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits and concluded that in 2012 a person actively resisting arrest did not have a clearly established right against a single use of a Taser to subdue him and still did not in 2015.  *Lash v. Lemke*, 786 1, 3, 7–

28

8 (D.C. Cir. 2015).   In contrast, the law was sufficiently clear in 2005 to inform a reasonable officer that it was unlawful to tase "a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).   "Active resistance" may include "verbal hostility" or a "deliberate act of defiance," but noncompliance alone does not indicate active resistance.   *Goodwin v. City of Painesville*, 781 F.3d 314, 323-24, 326 (4th Cir. 2015) (single statement by suspect that he would not leave his residence and the fact that he remained in his residence did not constitute active resistance to justify tasing).

Therefore, the law was clearly established as of March 1, 2014, that use of a Taser in dart mode constitutes an intermediate level of force that must be justified by the government interest involved.   It was also clearly established that the government's interest in the use of force depends on numerous factors, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers or others, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, whether the officer warned the suspect when a warning was feasible, whether less intrusive alternatives were available, and the totality of the circumstances.   But consideration of those factors here does not place the constitutional question beyond debate.

Severity of the crime.   The crime was potentially serious.   The crime for which Plaintiff was charged, misdemeanor disorderly conduct, is not serious, but at the time Officer Carrillo tased Plaintiff, Officer Carrillo had reason to suspect that Plaintiff had displayed a gun inside the restaurant.   At the time Officer Carrillo deployed his Taser, Plaintiff's crime potentially was a disorderly conduct felony because it was reported that Plaintiff and another man were involved in a high priority physical disturbance, and one

of the two men had displayed a gun.  *See* A.R.S. § 13-2904(B) (disorderly conduct that involves recklessly displaying a gun is a felony).

Attempting to evade arrest by flight.  Plaintiff testified that he stopped in the entrance of the restaurant when he was told to "hold on," he said "I gotta go," and he took off running.  Plaintiff ran away, attempting to evade arrest, regardless of whether Plaintiff heard subsequent orders to stop.  Plaintiff's conduct constituted active resistance.

Immediate threat.  At the time of the tasing, Plaintiff was potentially dangerous to Officer Carrillo or to others in the nearby motel because he may have been armed and his hands were not visible.  While Plaintiff was running away, with his back toward Officer Carrillo, he was not an *immediate* threat to Officer Carrillo, but he could have turned in an instant.  There were no other officers or bystanders in immediate danger.

Warning.  Officer Carrillo's usual practice is to issue a Taser warning, but he does have an actual memory of whether he did or not.  If he did issue the warning, he did not give Plaintiff much time to comply with orders to stop.

Less intrusive alternatives.  No less intrusive alternatives have been suggested, and none likely would have been safe and effective.  Officer Carrillo deployed his Taser only once.  He was not close enough to apply the Taser in drive-stun mode.

Totality of the circumstances.  Only 10 seconds passed between the time Officer Carrillo first saw Plaintiff and the time he deployed his Taser.  He was forced to make a split-second decision to stop a fleeing, potentially dangerous suspect.

A reasonable fact finder could conclude that Officer Carrillo's use of a Taser in dart mode against Plaintiff was unreasonable and unconstitutionally excessive, but the law was not clearly established in 2012—and is not now—that a single tasing of a fleeing suspect, who reportedly was involved in a physical disturbance and may have displayed a gun, after ordering him to stop, violates the Fourth Amendment.  Therefore, Officer Carrillo is entitled to qualified immunity on Plaintiff's § 1983 claim for excessive force.

Defendants' Motion for Summary Judgment will be granted regarding Plaintiff's claim for use of unconstitutionally excessive force.

### C.   Plaintiff's State Law Claims Against Officer Carrillo for False Imprisonment/False Arrest, Malicious Prosecution, and Assault

#### 1.   False Imprisonment/False Arrest and Malicious Prosecution

Plaintiff concedes that probable cause for arrest is a complete defense to claims of false arrest and malicious prosecution.  (Doc. 81 at 15.)  *See Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1966) ("where probable cause does exist[,] civil rights are not violated by an arrest even though innocence may subsequently be established").  "An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime."  *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011).  Probable cause analysis requires consideration of the facts known to the officer at the time of the arrest and the criminal statute to which those facts apply.  *Id.*

Under Arizona law, a person commits misdemeanor disorderly conduct by engaging in "fighting, violent or seriously disruptive behavior" or using "abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person."  A.R.S. § 13-2904(A)(1), (3).  Plaintiff contends that there was no evidence that Plaintiff was violent, fighting, or seriously disruptive.  Plaintiff incorrectly describes the video surveillance as showing he "was peacefully eating breakfast until he got up to leave" and that the record shows only that he was joking with a fellow customer.  In fact, the video surveillance shows Plaintiff gesturing and making comments to another customer across the room, walking over to the other customer's table, and then standing close to the other customer making gestures until a third man separated them.  It shows other groups of customers reacting to the commotion.  Further, the recording of the 911 phone call demonstrates that people were talking loudly and/or shouting near the manager.

For the purpose of determining probable cause, however, the only relevant evidence is what Officer Carrillo was told and saw. The dispatcher said it was a high priority disturbance and becoming physical. The manager, a credible witness, identified Plaintiff as one of those involved in the disturbance. A reasonably prudent person knowing what Officer Carrillo knew would believe that Plaintiff had committed misdemeanor disorderly conduct. Officer Carrillo had probable cause to detain and subsequently arrest Plaintiff for misdemeanor disorderly conduct. As soon as Officer Carrillo obtained confirmation of an outstanding arrest warrant, he had additional probable cause to arrest Plaintiff.

Therefore, Defendants' Motion for Summary Judgment will be granted regarding Plaintiff's claims for false imprisonment/false arrest and malicious prosecution.

### 2.    Assault

Under Arizona law, a person is justified in using physical force against another in making an arrest or in preventing the escape of that other person after arrest or detention if the following conditions exist:

> 1.    A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.
>
> 2.    Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
>
> 3.    A reasonable person would believe the arrest or detention to be lawful.

A.R.S. § 13-409; *see State v. Fontes*, 195 Ariz. 229, 232 ¶ 11, 986 P.2d 897, 900 (Ct. App. 1998) (officer can use physical force if a reasonable person would believe such force is immediately necessary to effect an arrest). Further, "[n]o person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter." A.R.S. § 13-413.

First, Officer Carrillo had probable cause to detain Plaintiff for disorderly conduct, and a reasonable person would believe the detention to be lawful. Second, it would be

reasonable for Officer Carrillo to believe that Plaintiff knew the purpose of his detention because Plaintiff knew the police officers had been called to the restaurant because of the disturbance and he was standing near the manager when she identified Plaintiff as one of those causing the disturbance.   Third, a reasonable person would believe that use of physical force would be necessary to effect the detention and prevent Plaintiff's escape because he was running away from Officer Carrillo across an open parking lot toward a motel, and no other police officers were around to stop him.

Therefore, under A.R.S. § 13-409, Officer Carrillo was justified in using physical force against Plaintiff.   Defendants' Motion for Summary Judgment will be granted regarding Plaintiff's claim for assault.

### D.   Punitive Damages

Plaintiff concedes that punitive damages are generally not recoverable against a municipality under either § 1983 or Arizona law, and he does not contend that Officer Carrillo acted with evil motive or intent.   Plaintiff asserts he can recover punitive damages against Officer Carrillo individually if he proves that Officer Carrillo acted with reckless and callous indifference, but he offers no evidence that Officer Carrillo acted with reckless and callous indifference.   Even if a jury were to find Officer Carrillo misapprehended the threat to his safety and the safety of others and should not have deployed a Taser to stop Plaintiff from fleeing, there would be no basis for awarding punitive damages.

IT IS THEREFORE ORDERED that Defendants' Objections to Plaintiff's Statement of Additional Facts (Doc. 93) are stricken as not authorized by the Federal Rules of Civil Procedure, the Local Rules, or court order.

IT IS FURTHER ORDERED that Defendants City of Yuma and Officer Joseph Carrillo's Motion for Summary Judgment (Doc. 71) is granted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IT IS FURTHER ORDERED that the Clerk enter judgment against Plaintiff Gavino Esquivel on his complaint and in favor of Defendants City of Yuma and Joseph Carrillo, and that Plaintiff take nothing.

IT IS FURTHER ORDERED vacating the April 27, 2016 Order setting a final pretrial conference, pretrial deadlines, and a jury trial (Doc. 98).

The Clerk shall terminate this case.

Dated this 29th day of April, 2016.

Neil V. Wake
United States District Judge